UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

URBAN ASSOCIATES, INC., a
Michigan corporation,

        Plaintiff,

      v.

                                    CASE NO. 4:04-CV-40059
                                    JUDGE MARK A. GOLDSMITH

STANDEX ELECTRONICS, INC., a               MAGISTRATE JUDGE PAUL KOMIVES
Delaware corporation, and STANDEX,
INTERNATIONAL CORP., a Delaware
corporation, jointly and severally,

        Defendants.

_____/

**REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION TO VACATE**
**OPINIONS/ORDERS AND THE APRIL 14, 2011 "FINAL AWARD" ISSUED BY THE**
**MAJORITY ARBITRATORS (docket #71)**

I.       RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.      REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      A.     *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
           1.    *Trial and Appellate Court Proceedings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
           2.    *The Arbitration Proceedings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
           3.    *The Current Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      B.     *Review of Arbitration Awards under the FAA Generally* . . . . . . . . . . . . . . . . . . . . . . . . 14
      C.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
           1.    *Partiality (§ 10(a)(2))* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
           2.    *Refusing to Hear Evidence (§ 10(a)(3))* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
           3.    *Exceeding/Imperfectly Executing Powers (§ 10(a)(4))* . . . . . . . . . . . . . . . . . . 24
      D.     *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
III.     NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

\*       \*       \*       \*       \*

I.       __RECOMMENDATION__: The Court should deny plaintiff's motion to vacate the majority

arbitrators' opinions/orders and final awards, and should enter an order confirming the award in

accordance with 9 U.S.C. § 9.

II.      __REPORT__:

A.     *Background*

1.      *Trial and Appellate Court Proceedings*

This matter is before the Court on plaintiff Urban Associates, Inc.'s motion to vacate an arbitration award.  The underlying dispute between the parties arises from a sales representation agreement.  The factual and procedural background through this Court's original grant of summary judgment to defendants Standex Electronics, Inc., and Standex International Corporation, are set forth in detail in the Sixth Circuit's opinion reversing in part the Court's grant of summary judgment:[1]

> In 1990, the predecessor to plaintiff Urban Associates, Inc. ("Urban") entered into a sales representative agreement ("agreement") with defendant Standex Electronics, Inc., a wholly-owned subsidiary of Standex International Corporation (collectively "Standex"). The agreement called for Urban to solicit requests for quotation ("RFQs") from potential customers in the automotive industry-primarily in Michigan-for Standex's custom-manufactured parts. In return, Standex agreed to pay Urban commissions for certain sales generated pursuant to an RFQ obtained by Urban. After Urban performed under the agreement for about twelve years, Standex exercised its contractual right to terminate the agreement on sixty days' written notice. At about the same time, Standex hired the Urban employee who had been soliciting customers under the agreement ("the sales representative"); that enabled Standex to have its own employee act as salesman, rather than paying commissions.
>
> Urban sued in the United States District Court for the Eastern District of Michigan, claiming that Standex breached the agreement by failing to pay commissions due on products that were shipped after the termination date pursuant to purchase orders that were booked before the termination date (count one). Urban also claimed that Standex terminated the agreement in a bad-faith effort to avoid paying commissions due (also count one). In the alternative, Urban argued that if it were found not entitled to commissions on the disputed shipments under the agreement, it was entitled to compensation in quantum meruit to avoid the unjust enrichment of Standex (count two). Urban further claimed that Standex tortiously interfered with its employment relationship with the sales representative by inducing her to leave Urban (count three), and it sought declaratory relief as to Standex's continuing obligations under counts two and three (count four).
>         . . . .

---

[1]This case was originally assigned to District Judge Paul V. Gadola and Magistrate Judge Virginia M. Morgan.  After the case was assigned to arbitration, Judge Gadola retired, and Judge Goldsmith became the District Judge as Judge Gadola's successor.  On September 14, 2011, the case was reassigned from Magistrate Judge Morgan to me in light of Magistrate Judge Morgan's retirement.

Urban was an independent sales representative enterprise that sold electronic components, primarily to the auto industry, on behalf of manufacturers. Standex is a manufacturer of electronic components and assemblies for use in the auto, communication, and medical industries.

Standex manufactures "engineered" parts, i.e., custom parts, which the parties agree require a great deal of effort before the final product reaches the consumer. First, the customer sends the specifications of its desired part to Standex with a request for a price quote. Second, Standex designs and engineers the part in order to ascertain how much to quote as its production price. If the customer accepts Standex's bid, Standex begins making the tooling equipment (molds and presses) needed to make the part; this process can entail the creation of prototypes and some pre-production approval steps. Once Standex finishes the design and sets up the equipment to manufacture the part, it waits for the customer's instructions as to how many parts to produce and when to deliver them. The time between development of a customer's RFQ and Standex's shipment of the custom parts can range from six months to a year.

When a customer decides that it is going to buy parts from Standex, the customer issues documentation indicating that Standex was awarded business for a given part, identified by part number, purchase order ("PO"), and percentage of the buyer's business in that part. The customer might issue a purchase order for a specified period of time, a reorder of the same part, or a blanket PO (discussed below). Once the customer issues an order, Standex puts it into an "open order" file and issues an Order Acknowledgment that lists the PO date, purchase price, the customer's part number, and Standex's internal part number. As Standex Vice-President ("VP") Charles Johnson testified at deposition, "[T]here was always a constant record on the computer that we received this purchase order, it has been acknowledged and the sales [credit] go to this sales representative and the deliveries are such and such."

The assigned part number remained the same as long as there was no change to the part; any revisions would be denoted by adding an alphabetical suffix to the part number. Johnson testified that Standex's objective was to obtain the customer's business for the life of the part or the life of the program.

A blanket PO specifies the customer's possible quantity requirements, the prices for various quantities of the part, and other terms. A blanket order did not obligate the customer to buy any parts, and it did not obligate Standex to make or ship any parts; those obligations did not arise until the customer issued a shipment order (also known as a production or release order) "against" the blanket PO. Blanket POs could last for a period of time-Standex customers' blanket PO's typically lasted up to a year-whereas a shipment order was a discrete order to be filled under the terms spelled out in the blanket PO. If a blanket PO expired and the customer still wished to buy more of the same part, the customer would issue another blanket PO and issue shipment orders against it as needed.

Before 2003, Standex used sales representatives to make initial contact and solicit RFQs from potential customers. While the representative was developing the

3

RFQ with the customer, he bore his own expenses; he was not entitled to commissions until the product shipped. Thus, a representative's commissions depended on the quantity of the product actually shipped.

In 1990, Urban's predecessor entered into an agreement to serve as Standex's sales representative, and, in 1992, Urban acquired the predecessor's assets and assumed its role under the agreement. The agreement, which was drafted by Johnson, contained only seventeen paragraphs. It provided, in part:

1. APPOINTMENT and ACCEPTANCE. The Company hereby appoints Representative as its sales representative to solicit orders for the sale of the products of the Company which are specified in Addendum "A" hereto ... from customers located in the territory designated in Addendum "B" hereto ... Representative hereby accepts such appointment and agrees to use its best efforts to aggressively solicit such orders from customers in the territory and to otherwise represent the interests of the Company in the Territory, in accordance with the terms and provisions of this Agreement.

2. TERM. This Agreement shall be effective as of the date specified above and shall continue in effect on an indefinite basis until terminated as provided in Section 10.

3. AUTHORITY. The Representative shall be the agent of the Company for the sole purpose of soliciting and receiving orders for the Products....

\* \* \*

7. COMMISSIONS. Subject to the provisions of Section 8, a commission of 5% shall be paid by the Company to the Representative, as his sole compensation hereunder, on the net sales value (invoice value less cash discounts, taxes, freight charges, transportation insurance, cancellations, returns, allowances and similar items) of shipments of Products made by the Company into the Territory as long as this agreement is in effect....

8. SPLIT COMMISSIONS. In the event that a particular order involves more than one territory ... the Company shall make a fair and equitable division of the commission applicable to that order....

9. EXPENSES. The Representative shall pay all expenses and bear all liability and obligations incurred in the operation of its business....

10. TERMINATION. This Agreement may be terminated, with or without cause, by either party.

4

If terminated by the Company, at least 60 days' prior written notice by certified or registered mail shall be given to the Representative. Such notice may be given at any time during any month or year and the termination date shall be 60 days from the date the notice is received by the Representative.

Upon termination by the Company, commissions shall be paid on all orders booked by the Representative and received by the Company in house prior to and including the termination date. No commissions shall be paid to the Representative for orders booked by the Representative and/or received by the Company after the termination date....

* * *

15. STATUS. The Representative shall be an independent contractor and not an employee or partner of the Company.

(emphasis added). The agreement also contained an integration clause, ¶ 13, and the parties do not rely on any purported written or oral undertaking other than this agreement. Urban and Standex executed written amendments to the agreement, but they did not alter the material terms quoted above, other than providing different commission rates for different products.

Pursuant to the agreement, Urban solicited orders for Standex's RF inductor coils, reed switches, reed relays, proximity sensors, toroids, and transformers from customers throughout the entire state of Michigan, except for Ford ETC and Ford EFHD, plus specified locations in Illinois and Indiana. Urban alleges that Standex's "business steadily increased after Urban became associated with Standex." Standex amended the agreement to add customers, and Standex named Urban its Salesman of the Year for 2000.

Sometime before June 30, 2001, Standex's Product Sales Manager Paul Linsley told Johnson that he wanted to hire Denise Falzone, the Urban employee then assigned as Standex's sales representative, directly, which would enable Standex to terminate its agreement with Urban and obviate the need to pay commissions. In July 2002, Standex general manager ("GM") James Anderson decided to terminate the agreement with Urban because he wished to eliminate sales representatives and use Standex employees as salesmen instead.

No later than early October 2002, Linsley called Falzone and told her that Anderson would be contacting her about "coming on board with Standex" and about Standex using direct salespeople. Within a week, Anderson contacted Falzone and told her that Standex was going to terminate Urban and go to direct sales, and that it was interested in hiring her. Later in October 2002, Anderson sent Falzone the Standex benefits binder, negotiations took place, and Falzone accepted a written offer of employment.

Standex sent a written notice of intent to terminate the agreement to Urban on

5

November 15, 2002, with an effective date of January 14, 2003. Urban alleges that "the reason for waiting at least 4 months to terminate Urban [from GM Anderson's July 2002 decision to terminate, to Standex's November 15, 2002 letter actually terminating the agreement] was to allow Standex time to secure for itself the direct employment of Falzon [sic, Falzone]...."

In mid-November 2002, just before Urban received the termination notice, Falzone notified Urban that she planned to quit on the last working day of that month. Falzone, who had worked for Urban for at least eight years (since 1993 or 1994), testified that she had a good relationship with Urban and had not been seeking other employment. Falzone immediately began working for Standex, serving essentially the same customers, for essentially the same products, as she had done as an Urban employee.

Standex paid commissions to Urban for orders shipped prior to the termination date, but it has not paid commissions for orders that were shipped after that date, even if Urban before that date had obtained ("booked") the purchase order against which the order was shipped.

. . . .

Urban filed a four-count complaint in district court in February 2004, asserting only state common-law claims, and Standex filed an answer in March 2004. In count one, Urban alleged that Standex breached the agreement in bad faith in order to avoid paying commissions on sales to customers assigned to Urban, "including customers located in Michigan, on business Plaintiff had already secured and/or on business Plaintiff had been previously working on that was likely to materialize and which did or will materialize." In count two, Urban contended that if the agreement did not expressly entitle Urban to the commissions sought, the court should order recovery under the doctrines of implied contract, quantum meruit /unjust enrichment, and/or "procuring cause." Urban seeks an amount equal to the 5% general contractual commission rate "on all business developed pursuant to the relationship between Plaintiff and Defendants for as long as Defendants benefit from such business...."

Count three sounds in tort but still relates to the sales representative agreement and relationship. Urban alleges that Standex knew about Falzone's employment relationship with Urban and the corresponding duties that she owed to Urban and wrongfully interfered with their relationship. Urban further alleges that Standex illegally induced Falzone to breach her duties to, and terminate her employment with, Urban, causing Urban to lose business, business opportunities, and goodwill. Finally, count four is denominated as a claim for declaratory relief, but it actually lists all the remedies sought by Urban, including compensatory damages, punitive ("exemplary") damages of three times actual damages, an accounting of commissions owed and not paid, and the creation of a constructive trust and escrow account for the payment of commissions accruing in the future.

Standex moved for summary judgment, Urban filed an opposition brief, and Standex filed a reply brief. Without oral argument, the district court granted summary judgment to Standex in January 2006. Urban timely filed a motion for reconsideration, which the district court denied in February 2006 without waiting for

opposition and reply briefs. Urban appealed two days later.

*Urban Assocs., Inc. v. Standex Elect., Inc.*, 216 Fed. Appx. 495, 497-501 (6th Cir. 2007) (footnotes

omitted) [hereinafter "*Urban II*"].

In granting summary judgment Judge Gadola, adopting the Recommendation of Magistrate

Judge Morgan, concluded that under Ohio law[2] the agreement was not ambiguous, and that

defendants' interpretation of the agreement was correct.  The Court explained:

> Here, the term "orders booked" is not susceptible to two or more reasonable
> interpretations. It is unreasonable to assume that Plaintiff would be due commissions
> on "orders" that would not create an enforceable obligation on the part of the
> customer to purchase the products ordered. *See Hudson vs. Tektronix, Inc*, 1982 Ohio
> App. LEXIS 12909 (Ohio Ct. App.1982) (unpublished); *Chicago Fineblanking Corp.
> v. D.J. Cotter & Co.*, 1996 U.S. Dist. LEXIS 21882 (E.D. Mich.1996) (unpublished).
> Plaintiff seems to argue that the Agreement vests commissions through a blanket
> purchase order, which commissions later become due when a shipment order is made
> by the customer. This interpretation, however, is not supported by the Agreement.
> The Agreement only provides for the payment of commissions "on the net sales value
> ... of shipments of Products made by the Company into the Territory as long as this
> agreement is in effect." Mot., Ex. C, ¶ 7 (emphasis added). The agreement does not
> provide for commission on a "life of the part" basis because commissions are not paid
> on shipments made after termination of the Agreement. Neither is the interpretation
> supported by extrinsic evidence. Mot., Ex. B at 16; Resp., Ex. 2 at 56, 72, 77-78, 80;
> Mot., Ex. G at 2-3.
> Defendants owed commissions to Plaintiff for the "orders booked" that
> resulted in the obligation on the part of the customer to purchase the product so
> ordered. That obligation arose through the a customer's shipment or release order,
> which, when combined with the terms of the blanket purchase order against which it
> was made, would determine the obligations of the contracting parties and the
> commissions due Plaintiff. Defendants have paid Plaintiff all the commissions due
> in this manner and are therefore entitled to summary judgment on this claim.

*Urban Associates, Inc. v. Standex Electronics, Inc.*, No. 04-40059, 2006 WL 250020, at *4 (E.D.

Mich. Jan. 30, 2006) [hereinafter "*Urban I*"].  The Court also granted summary judgment on

---

[2]Ohio law governed the interpretation of the agreement and plaintiff's contract claims pursuant
to the contractual choice of law provision, while tort claim was governed by Michigan law.  *See Urban
II*, 216 Fed. Appx. at 501 n.2.

plaintiff's claims for bad faith breach of the agreement, *quantum meruit*, and tortious interference. *See id*. at *4-*5. The Sixth Circuit reversed Judge Gadola's grant of summary judgment with respect to the breach of contract claim relating to the commissions. The court held that, under Ohio law, the contractual provision governing commissions on "orders booked" was ambiguous, creating the need to rely on extrinsic evidence to interpret the provision. *See Urban II*, 216 Fed. Appx. at 504-06. Turning to the extrinsic evidence submitted by the parties, the Sixth Circuit concluded that plaintiff had presented sufficient evidence from which a jury could adopt its interpretation of the "orders booked" language. The court explained that "[r]eading the agreement as a whole and considering all the extrinsic evidence, a reasonable factfinder could conclude that the parties intended Urban to receive post-termination commissions at least for the life of the POs that were received prior to the termination date," *id*. at 508, and concluded that because "Urban presented ample evidence from which a reasonable factfinder could adopt one of its two preferred interpretations of the term[,] . . . the district court erred in granting summary judgment to Standex on the breach-of-contract claim contained in count one." *Id*. at 509. The court, however, affirmed Judge Gadola's grant of summary judgment to defendants on plaintiff's other claims. *See id*. at 509-15.

After the Sixth Circuit issued its mandate, plaintiff filed a motion for partial summary judgment, in which it argued that the Sixth Circuit's decision established its entitlement to post-termination commissions for either the life of the part or the life of the purchase order. Magistrate Judge Morgan filed a Report recommending that the Court deny the motion. Specifically, Magistrate Judge Morgan concluded that the Sixth Circuit had not adopted plaintiff's proposed interpretation of the contract; rather, that court held only that (a) Judge Gadola had erred in finding that the contract was unambiguous, and (b) the extrinsic evidence supporting plaintiff's argument regarding the

8

4:04-cv-40059-MAG-PJK   Doc # 84   Filed 02/17/12   Pg 9 of 32   Pg ID 2304

contract's meaning was sufficient to withstand summary judgment and allow the case to proceed to trial. Therefore, Magistrate Judge Morgan concluded, the law of the case doctrine did not entitle plaintiff to summary judgment. *See* Report & Recommendation, dated 11/15/07, at 4-6. Judge Gadola subsequently adopted the Report and Recommendation. *See* Order, dated 1/18/08.

Shortly before the scheduled trial date, the parties agreed to submit the matter to binding arbitration. On February 25, 2008, Judge Gadola entered a stipulated order which provided for an arbitration panel composed of one arbitrator selected by each of the parties, and a neutral arbitrator selected by the two party chosen arbitrators. In the event the party-chosen arbitrators could not agree on a neutral third arbitrator, the parties were to submit a list of four potential neutral arbitrators (two each), from which the Court would select the arbitrator. The neutral arbitrator was essentially named as the presiding arbitrator, with the power to initiate scheduling matters and conduct pre-hearing conferences. *See* Stipulated Order, dated 2/25/08, ¶¶ 3-4 [hereinafter "Arbitration Order"]. The Order provided that the arbitrators would not be strictly bound by the Michigan or Federal Rules of Evidence, that the parties could not call witnesses not listed in the parties' witness lists filed in the court action, and that the parties could not rely on documents not previously produced, with the exception of certain additional documents Standex was ordered to produce. *See id.*, ¶¶ 8, 11-12. Substantively, the Order: directed that the arbitrators determine the applicability of both the Ohio Sales Representative Commission Act (OSRCA) and the Michigan Sales Representative Commission Act (MSRCA), *see id.*, ¶¶ 6-7; provided that "[t]he Arbitrators are to receive and be bound by the Court of Appeals['] opinion in this case and the recommendation of the magistrate [judge] denying Urban's motion for summary judgment under the law of the case doctrine," *id.*, ¶ 5; prohibited Standex from "assert[ing] that Urban should not be paid a commission on the sales of parts in issue

because of engineering or design," but did not "affect any defense of Standex based on the assertion that it received new orders for parts after termination nor . . . affect Urban's position that it is entitled to LOP/LOP regardless of new orders after termination." *Id.*, ¶ 13.

      2.    *The Arbitration Proceedings*

The parties proceeded to arbitration before a panel consisting of Frederick Lauck, the arbitrator selected by plaintiff; Daniel Rustmann, the arbitrator selected by defendant; and former Oakland County Circuit Court Judge Robert B. Webster, the neutral arbitrator selected by Judge Gadola after the parties were unable to agree on a neutral arbitrator. The Panel first considered defendants' motion to dismiss the claim under the MSRCA and to bar reference to or evidence related to the OSCRA. On February 18, 2009, the Panel issued an opinion granting defendant's motion. *See* Def.s' Br., Ex. 2.[3] Arbitrator Lauck dissented from the Panel's opinion. The order also denied plaintiff's motion to bifurcate the issues, without prejudice to the parties submitting a stipulated order for bifurcation, set a briefing deadline of March 9, 2009, and set a trial date of March 23, 2009. *See id.* The parties subsequently entered a stipulation regarding bifurcation, which provided that the March 23 hearing would be "limited to the issue of contract construction and the panel shall make a determination of which of the parties' proposed interpretations of the contract regarding post termination commissions should be adopted or if some other interpretation should be adopted." *Id.*, Ex. 3. The stipulation also provided that the panel would choose another date for a hearing on damages if necessary. *See id.* The Panel conducted a three day hearing on March 23-25, 2009. At the hearing, the parties presented the testimony of Craig Urban, plaintiff's principal;

---

[3]The Arbitration Order provided that the Panel's "determination shall be issued in the form of an award without a reasoned opinion, unless otherwise stipulated to by the parties." Arbitration Order, ¶ 14. Consistent with this directive, all of the Panel's opinions in this matter stated the Panel's conclusions without a fully reasoned discussion of the issues.

Charles Johnson, defendants' former vice-president; plaintiff's expert Charles Mathews; and defendant's expert Alan Smith. *See id.*, Ex. 4; Pl.'s Br., Ex. 20. On May 11, 2009, the Panel issued an opinion determining that plaintiff "is entitled to post termination commissions only on any binding releases issued prior to termination for shipment subsequent to termination or on any long term agreements (fixed term requirements contracts) procured by Plaintiff prior to termination, the term of which extended past termination of Plaintiff ('Allowed Commissions')." Def.s' Br., Ex. 6. Arbitrator Lauck again dissented from the Panel's determination. Based on the parties' stipulation for bifurcation, the Panel set a hearing for May 20, 2009, for plaintiff to present evidence of Allowed Commissions that were unpaid. *See id.*

At the May 20 hearing, the parties and the Panel principally discussed a discovery issue, which included a discussion of what exactly "Allowed Commissions" consisted, as well as a discussion about pre-termination commissions. At the end of the discussion, the Panel ordered further briefing on these issues. *See id.*, Ex. 7. As part of that discussion, Arbitrator Rustmann indicated that his definition of "orders booked" envisioned "an exclusive contract, we are going to buy all of our requirements of X number of parts from you for this year, and then there is a binding commitment to buy whatever our requirements are of those contracts." *Id.* at 25. On June 2, 2009, the Panel issued a briefing schedule, which: (1) directed plaintiff to submit by July 24 a brief identifying all contracts that plaintiff believed constituted "'long term agreements (fixed term requirements contracts) procured by Plaintiff prior to termination,' as that term was clarified at the hearing on May 20, 2009," with "sufficient documents" attached "to demonstrate a prima facie basis for each contract claimed;" (2) directed the parties confer thereafter "to attempt to reach agreement on whether any contracts identified fit the definition and regarding the production of any additional

11

documents; (3) set deadlines of August 31 for defendants' response and September 15 for plaintiff's reply; and (4) directed defendant to file a brief setting forth its argument that plaintiff's claim for pre-termination commissions is not within the scope of the arbitration proceeding, and set response and reply deadlines of August 31 and September 15. *Id.*, Ex. 8. Arbitrator Lauck dissented from the portion of the order to the extent it was based on the term fixed parts requirement contracts "as that term was clarified and defined at the hearing on May 20, 2009," because he did not agree that the Panel's original opinion "can be verbally modified." *Id.*, Ex. 9. In accordance with the scheduling order, plaintiff submitted a bullet point brief identifying the contracts upon which it contended it was due commissions under the Panel's construction of the contract. The brief also identified the evidence at the hearing and additional evidence not offered at the hearing that it contended supported its argument. *See id.*, Ex. 10. In addition, plaintiff submitted the affidavit of rebuttal expert Peter Rosenfeld, who described why the contracts identified by defendant constituted fixed term requirements contracts under the Panel's definition. *See* Pl.'s Br., Ex. 10. Defendant filed a response brief arguing that contracts identified by plaintiff were simply blanket purchase orders which did not meet the Panel's definition, and thus that plaintiff was not entitled to post-termination commissions on any of the contracts identified by plaintiff, and plaintiff filed a response brief. *See* Def.s' Br., Exs. 11-12. On November 9, 2009, the Panel issued an opinion: (1) granting defendant's motion to strike Rosenfeld as a witness; (2) determining that plaintiff would be permitted to present evidence of pre-termination commissions it claims were not paid; (3) determining that "the only contract that could potentially be deemed to be a 'long term agreement (fixed term contract)' under the panels' [sic] prior order was the TRW contract regarding Part Nos. 152943-1 and 152944-1;" and (4) set a hearing for December 7, 2009, on the pre-termination commissions issue and to take evidence regarding the

12

TRW contracts.  Arbitrator Lauck dissented from the Panel's opinion, except with respect to the pre-termination commission issue.  *See id.*, Ex. 13.

Plaintiff subsequently filed a motion for reconsideration, arguing that the Panel majority had erred in the substance of its decision, and had erred in striking plaintiff's rebuttal expert and failing to ensure plaintiff obtained adequate discovery.  *See id.*, Ex. 14.  On April 14, 2010, after defendants had filed a response, *see id.*, Ex. 15, the panel heard argument on the motion, *see id.*, Ex. 16.  On May 13, 2010, the Panel issued an order denying the motion for reconsideration.  Arbitrator Lauck again dissented from the Panel's order.  *See id.*, Ex. 5.  The Panel then conducted a four day hearing on defendants' liability on the TRW contracts on September 9-10, 2010 and January 11-12, 2011, which included the testimony of several witnesses, the introduction of a number of exhibits, and extensive argument by counsel for the parties.  *See id.*, Exs. 17-18, 20, 24. On April 14, 2011, the Panel issued its final award, awarding plaintiff "damages against Standex Electronics, Inc. in the amount of $116,209.54, plus pre-judgment interest on this award for the period from February 20, 2004 to March 28, 2011, in the amount of $32,481.75, for a total award in the amount of $148,691.29."  *Id.*, Ex. 17.[4]  Arbitrator Lauck issued an extensive dissenting opinion, in which he opined that the majority erred in:  (1) exceeding its jurisdictional mandate by determining what the term "orders booked" meant as a matter of law, rather than resolving the meaning of the phrase as a matter of fact, as required by the Sixth Circuit's decision; (2) ignoring the testimony of James Anderson, defendants' vice president of sales, regarding the meaning of the term "orders booked;" and (3) failing to require defendants to provide additional discovery.  *See* Pl.'s Br., Ex. 13.

---

[4]The final award is dated March 28, 2011.  However, through an e-mail correspondence, a majority of the panel (Arbitrators Webster and Lauck) determined that the date of the award should be April 14, 2011, the date the award was received by the parties.  *See* Pl.'s Br., Ex. 13.

13

3. *The Current Motion*

On July 6, 2011, plaintiff filed this motion to vacate the Panel's opinions and orders and its April 14, 2011, final award, pursuant to § 10 of the Federal Arbitration Act (FAA), 9 U.S.C. § 10. Plaintiff contends that the Panel's award must be vacated because the majority arbitrators: (1) failed to abide by the law of the case; (2) deprived plaintiff of a fundamentally fair hearing; (3) exceeded their powers or so imperfectly executed them that a final award was not made; (4) acted with manifest disregard of the law; (5) failed to render an award in conformity with the evidence presented in the hearing; (6) refused to hear evidence pertinent to the controversy; and (7) exhibited evident partiality. Defendants filed a response on July 25, 2011, and plaintiff filed a reply on August 10, 2011.

B. *Review of Arbitration Awards under the FAA Generally*

The Federal Arbitration Act expresses a national policy favoring arbitration and the enforceability of both arbitration agreements and arbitration awards. *See Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008). To this end, the FAA "expresses a presumption that arbitration awards will be confirmed." *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005) (citing 9 U.S.C. § 9); *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000). "Under the terms of § 9, a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11." *Hall Street*, 552 U.S. at 582. Pursuant to § 10, a court may vacate an arbitration award

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any

14

party have been prejudiced; or
      (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10.[5]  These four situations represent the exclusive circumstances in which a court may

vacate an arbitration award.  *See Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2781 (2010);

*Hall Street*, 552 U.S. at 584.

      In light of the policies underlying the FAA, a party seeking to vacate an arbitration award

"must clear a high hurdle."  *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, 130 S. Ct. 1758, 1767

(2010).  A court's review of an arbitrator's decision "is very narrow; one of the narrowest standards

of judicial review in all of American jurisprudence."  *Nationwide Mut.*, 429 F.3d at 643 (internal

quotation omitted).   "It is not enough for [the party seeking vacatur] to show that the panel

committed an error–or even a serious error."  *Stolt-Nielsen*, 130 S. Ct. at 1767; *see also*, *United*

*Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987) ("[A]s long as the arbitrator is even

arguably construing or applying the contract and acting within the scope of his authority, that a court

is convinced he committed serious error does not suffice to overturn his decision.").

C.    *Analysis*

      Plaintiff does not allege that the arbitration award was procured by fraud or undue means

under § 10(a)(1).  Plaintiff does, however, seek an order vacating the arbitrators' award under the

remaining three provisions of § 10(a).  As discussed more fully below, the Court should conclude

that plaintiff has failed to "clear [the] high hurdle" of showing that the award should be vacated

under any of these provisions.

---

    [5]"Section 10 lists grounds for vacating an award, while § 11 names those for modifying or correcting one."  *Hall Street*, 552 U.S. at 582.  Plaintiff does not seek modification or correction of the arbitration award under § 11, and thus that provision is not discussed further here.

1.      *Partiality (§ 10(a)(2))*

Plaintiff contends that the award should be vacated because the majority arbitrators were predisposed against it.  Plaintiff argues that this bias is demonstrated by the fact that the majority stated, prior to the presentation of any proofs, that Judge Gadola was correct in determining that the contract was unambiguous and that the Sixth Circuit erred in making the contrary ruling.  Plaintiff further argues that the bias of the majority is demonstrated by the fact that Arbitrator Rustmann, the arbitrator selected by defendant, "took over control of the proceedings," "testified," and "drafted the Opinions (a task that, in [plaintiff's counsel's] experience has been done by the neutral."  Pl.'s Br., at 29.  None of these arguments, however, establishes that the majority arbitrators were biased or corrupt under § 10(a)(2).

To justify vacating an award under § 10(a)(2),

> the challenging party must show that a reasonable person would have to conclude that an arbitrator was partial' to the other party to the arbitration.  In order to sustain that burden, the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator.  It is not enough to  demonstrate an amorphous institutional predisposition toward the other side, because that would simply be the appearance-of-bias standard that we have previously rejected.

*Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 306-07 (6th Cir. 2008) (internal quotations and citations omitted).

Plaintiff has pointed to no specific facts showing that Arbitrators Webster and Rustmann had an improper motive, such as a longstanding and ongoing personal or professional relationship with defendant or a financial interest in the outcome of the proceedings.  *Cf. Lucent Techs., Inc. v. Tatung Co.*, 379 F.3d 24, 31 (2d Cir. 2004); *Uhl v. Komatsu Forklift Co., Ltd.*, 466 F. Supp. 2d 899, 906-07 (E.D. Mich. 2006) (Lawson, J.) (no evident partiality shown by fact that arbitrator and counsel for one of the parties had past dealings in prior litigation, where there was no evidence of a business

16

relationship or that arbitrator had any financial interest in the outcome of the arbitration), *aff'd*, 512 F.3d 294, 307-08 (6th Cir. 2008); *Tinaway v. Merrill Lynch & Co., Inc.*, 692 F. Supp. 220, 225 (S.D.N.Y. 1988) (quotation omitted) (refusing to vacate arbitration award where there was "no evidence of any direct business or personal relationship between the arbitrators and defendants," and noting that the "'evident partiality or corruption' language of 9 U.S.C. § 10(b), is confined to situations where the arbitrator has had dealings or relationships with one of the parties what might cause him to be biased."). *See generally*, *Hobet Mining, Inc. v. International Union, United Mine Workers of Am.*, 877 F. Supp. 1011, 1021 (S.D. W. Va. 1994) (citations and quotations omitted) (in evaluating claim of evident partiality, court considers "(1) any personal interest, pecuniary or otherwise, the arbitrator has in the proceeding, (2) the directness of the relationship between the arbitrator and the party he is alleged to favor, keeping in mind that the relationship must be substantial, rather than trivial, in order to establish evident partiality, (3) the relationship's connection to the arbitration, and (4) the proximity in time between the relationship and the arbitration proceeding.").

The fact that the majority arbitrators ruled against plaintiff, even repeatedly, does not establish that they did so for improper motives and thus provides no evidence of evident partiality. *See Biller v. Toyota Motor Corp.*, No. CV 09-5429, 2011 WL 1103630, at *2 (C.D. Cal. Mar. 17, 2011), *aff'd*, ___ F.3d ___, 2012 WL 336135 (9th Cir. Feb. 3, 2012); *Midwest Generation EME, LLC v. Continuum Chemical Corp.*, 768 F. Supp. 2d 939, 948 (N.D. Ill. 2010); *Thian Lok Tio v. Washington Hosp. Ctr.*, 753 F. Supp. 2d 9, 17-18 (D.D.C. 2010). As the Ninth Circuit has explained, "[e]ven repeated rulings against one party to the arbitration will not establish bias absent some evidence of improper motivation." *Sheet Metal Workers Int'l Ass'n v. Kinney Air Conditioning Co.*,

17

756 F.2d 742, 746 (9th Cir.1985), *quoted with approval by Andersons, Inc. v. Horton Farms, Inc.*, 168 F.3d 308, 330 (6th Cir. 1998).   Further, plaintiff fails to explain how Arbitrator Rustmann's alleged drafting of the majority's decisions, rather than Arbitrator Webster having done so, evidences partiality rather than simply how the arbitrators chose to assign the workload amongst themselves. Nor is there any merit to plaintiff's claim that Arbitrator Rustmann "commandeered" the proceedings or "testified."   A review of the transcripts of the various hearings demonstrates that counsel for the parties engaged in extensive oral argument respecting their positions on the issues, and that all of the arbitrators were active participants in this oral argument.   To be sure, as plaintiff notes, Arbitrator Rustmann did rely on his own experience in the automotive industry as an attorney in questioning counsel about the contracts at issue and may very well have done so in reaching his decision. *See* Pl.'s Br., at 20-22 (citing various statements at the arbitration hearings).   There was nothing improper, however, in his having done so. *See Arlington Towers Land Corp. v. John McShain, Inc.*, 150 F. Supp. 904, 927 (D.D.C. 1957) ("When an arbitrator is himself an expert in the field of the arbitrated controversy, he is empowered, unless specifically restricted, to exercise a discretion predicated upon the length and area of his expertness. It is not improper, therefore, with an Arbitrator who has been selected as an expert, to accept his findings as a matter of discretion, even though they are in conflict with the testimony offered to him."); *cf. United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581-82 (1960) ("The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial custom-the practices of the industry and the shop-is equally a part of the collective bargaining agreement although not expressed in it."). Indeed, this is one of the very reasons parties choose arbitration–so that arbitrators may bring their expertise to bear on an otherwise complicated matter outside the ken of a generalist judge or a lay

18

jury.  *See Brotherhood of Locomotive Engineers & Trainmen Gen'l Comm. of Adjustment v. CSX Transp., Inc.*, 455 F.3d 1313, 1316 (11th Cir. 2006) ("[A]rbitration law wisely relies upon the experience, perspective, understanding of industrial practice, and knowledge of logistics and economics, of the officer chosen as arbitrator."); *In re Raymond Professional Group, Inc.*, 397 B.R. 414, 434 (Bankr. N.D. Ill. 2008) ("Relying on its experience in the construction industry, and the testimony of experts and auditors, the Panel determined what were to be included as 'costs.' That is the sort of judgment that arbitrators make and is illustrative of the reason why parties choose experienced arbitrators to apply industry standards instead of trying to educate judges and jurors.").

Because plaintiff has failed to "establish specific facts that indicate improper motives on the part of the arbitrator," *Uhl*, 512 F.3d at 306, the Court should conclude that plaintiff is not entitled to an order vacating the final award under § 10(a)(2).

2.      *Refusing to Hear Evidence (§ 10(a)(3))*

Plaintiff also contends that the award should be vacated because the Panel refused to hear pertinent evidence and prevented it from obtaining discovery.  It is well established that "[a]rbitrators are not bound by formal rules of procedure and evidence, and the standard for judicial review of arbitration procedures is merely whether a party to arbitration has been denied a fundamentally fair hearing." *National Post Office Mailhandlers v. United States Postal Serv.*, 751 F.2d 834, 841 (6th Cir.1985).  Because arbitrators "should be expected to act affirmatively to simplify and expedite the proceedings before [them]," *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Tex.*, 915 F.2d 1017, 1022 (5th Cir. 1990); *see also*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991) (citation omitted) ("by agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'"), "[a]rbitrators are not

19

bound to hear all the evidence tendered by the parties; they need only afford each party the opportunity to present their arguments and evidence." *Terk Tech. Corp. v. Dockery*, 86 F. Supp. 2d 706, 708 (E.D. Mich. 2000) (Duggan, J.). Thus, not every failure to receive evidence constitutes misconduct; rather the question is whether a party was so prejudiced that it was deprived of fundamentally fair proceeding. *See Century Indemnity Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 557 (3d Cir. 2009); *Fairchild Corp. v. Alcoa, Inc.*, 510 F. Supp. 2d 280, 287 (S.D.N.Y. 2007).

Here, it cannot be said that plaintiff was so deprived of the opportunity to present its arguments and evidence that it was denied a fundamentally fair proceeding. The Panel conducted a multi-day hearing on the contract construction issue, taking the testimony of both a fact witness and an expert witness from each side. The Panel subsequently convened a hearing on the issue of liability, at which time it become apparent that there was some confusion over the majority's construction of the relevant contract language. After the majority's ruling was clarified, plaintiff's counsel suggested that the Panel adopt a streamlined process whereby plaintiff would present "in summary fashion" the contracts it felt came within the Panel's construction of the contract. *See* Def.'s Br., Ex. 7, at 79. An extensive discussion then ensued between the arbitrators and counsel for the parties regarding what type of purchase orders would fit the Panel's definition and the procedure for establishing these contracts, with suggestions that plaintiff would submit a bullet point brief providing sufficient information to establish a *prima facie* case with respect to each purchase order plaintiff contended fell within the Panel's construction of the contract, with further discovery potentially necessary after the parties' briefs were filed. *See id*. at 90-102. Subsequent to the hearing, the Panel entered a scheduling order which required plaintiff to submit "a document

identifying all contracts which Plaintiff believes constitute 'long term agreements (fixed term requirements contracts) procured by Plaintiff prior to termination,'" and further required plaintiff to "attach sufficient documents to demonstrate a prima facie basis for each contract claim and . . . indicate if it desires production of additional documents from Defendant." *Id*., Ex. 8, ¶ 1.  In response to this order, plaintiff submitted a brief detailing purchase orders for 34 different parts from seven different customers which it contended met the Panel's definition.  With respect to each part, plaintiff identified exhibits which had been offered at the prior hearing that supported its position, as well as provided a description of other documents which supported its position.  *See id*., Ex. 10. The only additional discovery sought by plaintiff in this brief related to pre-termination commissions, not to the post-termination commission issue.  *See id*.  After defendant filed a brief arguing that the orders identified by plaintiff did not meet the Panel's definition, plaintiff filed a lengthy reply brief addressing defendants' arguments.  *See id*., Ex. 12.  Based on the parties' submissions, the Panel majority determined that only one contract regarding two parts "could potentially be deemed to be a 'long term agreement (fixed term requirements contract)' under the panels' prior order," and ordered an evidentiary hearing "to accept further proofs with respect to the negotiations and Purchase Order for these two TRW parts." *Id*., Ex. 13, ¶ 3.  Plaintiff further filed a motion for reconsideration, in which it again argued the issue with respect to each contract, identifying evidence in the record it contended supported its claims.  *See id*., Ex. 14.  The panel also granted a hearing on the motion for reconsideration.  *See id*., Ex. 16.  Finally, the panel conducted a lengthy hearing with regards to the pretermination commission issue and the two parts which might fight the Panel's definition.  *See id*., Exs. 17-18, 20, 24.

Plaintiff fails to explain how it was precluded from presenting any evidence by the

streamlined procedure adopted by the Panel majority. Much of its brief regarding the parts plaintiff

contended were covered by the Panel's definition relied on exhibits that had already been produced

to the Panel at a prior hearing. Further, plaintiff was permitted to identify further evidence in support

of its contention, essentially making an offer of proof. Based on that submission, the Panel majority

found that all but two of the parts did not fit within the Panel's definition. With respect to each part,

the evidence already admitted included various communications between defendant and the

purchaser, as well as the actual purchase orders, and the additional evidence identified by plaintiff

quoted what plaintiff viewed as the relevant information in the document. *See* Def.'s Br., Ex. 10, at

5-16. The majority determined that this information did not provide *prima facie* proof that any of

the contracts (except for the two TRW parts) meet the Panel's definition. To be sure, plaintiff

disagrees with this conclusion, and contends that the Panel could only have reached this conclusion

by failing to consider its evidence. That does not mean, however, that it was precluded from

presenting any evidence. Simply put, the Panel considered the evidence submitted by plaintiff, and

concluded that the evidence was insufficient to show that plaintiff was entitled to post-termination

commissions based on the Panel's construction of the contract. *Cf. Century Indem. Co.*, 584 F.3d

at 559. Moreover, apart from its rebuttal expert, which is discussed below, plaintiff does not identify

any specific evidence beyond that already presented to the panel or for which it made an offer of

proof in its brief to the panel which it contends it was precluded from presenting to the Panel. As

the party seeking to vacate the arbitration award, it is plaintiff's burden to establish "that the

excluded evidence was critical to [its] case or that the exclusion of the testimony deprived [it] of a

fundamentally fair hearing." *Thian Lok Tio*, 753 F. Supp. 2d at 19. By failing to identify any

particular evidence the Panel failed to consider, plaintiff has failed to meet this burden. *See Hilliard*

22

*v. Reisen*, No. 1:09-cv-535, 2010 WL 793850, at *3 (S.D. Ohio Mar. 2, 2010); *Marshall & Co., Inc. v. Duke*, 941 F. Supp. 1207, 1212 (N.D. Ga. 1995) ("[D]efendants have failed to direct the Court's attention to any specific evidence they were prevented from presenting and have failed to demonstrate any prejudice arising from such a lack of evidence."); *Grinnell Housing Dev. Fund Corp. v. Local 32B-32J, Service Employees Int'l Union*, 767 F. Supp. 63, 67 (S.D.N.Y. 1991) (vacating of arbitration award based on arbitrator's refusal to consider evidence not warranted where party challenging award did "not set forth with any specificity what evidence, if any, it would have presented[.]").

Nor can plaintiff show that it was denied a fundamentally fair proceeding by the Panel's striking of its rebuttal expert witness. The Arbitration Order to which plaintiff stipulated explicitly provided that the parties were prohibited from calling "witnesses in the Arbitration proceeding that were not listed on the parties' witness lists filed in the federal court action except for unanticipated rebuttal witnesses to the extent authorized by FRCP and Federal Rules of Evidence." Arbitration Order, ¶ 8. Although plaintiff attempts to characterize Mr. Rosenfeld as a rebuttal witness, a review of his affidavit does not support this characterization. Mr. Rosenfeld's affidavit addresses the proper definition of the "orders booked" language of the contract and whether the blanket purchase orders were within the post-termination commissions' provision of the contract. As plaintiff itself argues, Mr. Rosenfeld's affidavit was offered to "refute[] Arbitrator Rustmann's 'testimony' and definition and redefinition of 'orders booked.'" Pl.'s Br., at 25; *see also*, Reply Br., at 9 ("Certainly the Majority's admission to clarifying and redefining 'orders booked' supported the need for Urban's rebuttal expert witness testimony, which Urban could not anticipate until the Majority began defining, redefining and 'clarifying' this pivotal term."). By plaintiff's own argument, Mr. Rosenfeld

was offered not to rebut any evidence presented by defendant, but to provide additional evidence in an attempt to have the panel reconsider its definition of the term "orders booked." The issue of the proper construction of the "order booked" language was not something new introduced by the panel; it was the key issue in the case from the outset of the litigation. "Rebuttal is a term of art, denoting evidence introduced by a Plaintiff to meet new facts brought out in his opponent's case in chief." *Morgan v. Commercial Union Assur. Cos.*, 606 F.2d 554, 555 (5th Cir. 1979). As the Sixth Circuit has explained, "[r]eal rebuttal evidence is evidence presented to rebut 'new' evidence, and evidence is new if, under all the facts and circumstances, the evidence was not fairly and adequately presented to the trier of fact before the defendant's case-in-chief." *Varga v. Rockwell Intern. Corp.*, 242 F.3d 693, 701 (6th Cir. 2001) (internal quotation omitted). Mr. Rosenfeld's affidavit did not rebut any new evidence, and plaintiff presented significant evidence and argument, including expert reports, in both in the court proceedings and the arbitration proceedings. Thus, the Panel's striking of the rebuttal witness was consistent with the Arbitration Order and did not deprive plaintiff of a fundamentally fair arbitration proceeding.

Accordingly, the Court should conclude that the Panel's award is not subject to vacatur under § 10(a)(3).

### 3.    *Exceeding/Imperfectly Executing Powers (§ 10(a)(4))*

Finally, plaintiff argues that the Panel majority exceeded or so imperfectly executed its powers that a definite and final award was not made, and thus the award must be vacated under § 10(a)(4). More specifically, plaintiff argues that the Panel acted in manifest disregard of the law by failing to abide by the Sixth Circuit's decision, adopted a construction of the agreement that was contrary to the objective evidence submitted in the arbitration proceeding, and erred in finding that

24

the orders identified by plaintiff as falling under the Panel's definition did not meet the Panel's

understanding of the term "orders booked."  The Court should conclude that plaintiff is not entitled

to vacatur of the award under § 10(a)(4).

"Under the manifest-disregard-of-the law standard, [a court] may set aside the arbitrator's

decision only if, after applying 'clearly established legal precedent, . . . no judge or group of judges

could conceivably come to the same determination.'" *Ozormoor v. T-Mobile USA, Inc.*, ___ Fed.

Appx. ___, ___, 2012 WL 232951, at *2 (6th Cir. Jan. 25, 2012) (quoting *Merrill Lynch, Pierce,

Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)).  To constitute a manifest disregard

for the law, "[a] mere error in interpretation or application of the law is insufficient. Rather, the

decision must fly in the face of clearly established legal precedent."  *Jaros*, 70 F.3d at 421. Thus, an

arbitrator acts with manifest disregard if "(1) the applicable legal principle is clearly defined and not

subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle." *Id*.[6]

Plaintiff argues that the Panel acted in manifest disregard of the Sixth Circuit's decision by

adopting defendant's construction of the contract.  Essentially, plaintiff's argument boils down to the

argument that the Sixth Circuit's decision obligated the Panel, under the law of the case doctrine and

---

[6]As the Sixth Circuit has explained, "the ability to challenge an arbitration award on the ground that it represents a 'manifest disregard of the law' amounts to a separate judicially created basis for vacating an award." *Ozormoor*, ___ Fed. Appx. at ___, 2012 WL 232951, at *2. Because of this, there is some doubt as to whether the manifest disregard of the law basis survives the Supreme Court's decision in *Hall Street Assocs.* that the bases set forth in § 10(a) represent the exclusive basis for vacating an arbitration award.  *See id.*; *Grain v. Trinity Health, Mercy Health Servs., Inc.*, 551 F.3d 374, 380 (6th Cir. 2008).  In *Hall Street Assocs.* the Court left open the possibility that the manifest disregard test "merely referred to the § 10 grounds collectively, rather than adding to them," or "may have been shorthand for § 10(a)(3) and or § 10(a)(4)." *Hall Street Assocs.*, 552 U.S. at 585.  And in *Stolt-Nielsen* the Court explicitly declined to decide whether the manifest disregard test survives *Hall Street Assocs.*  *See Stolt-Nielsen*, 130 S. Ct. at 1768 n.3.  The courts in the Sixth Circuit have generally applied the manifest disregard basis without deciding whether it actually continues to provide a valid basis for vacating an arbitration award. *See, e.g.*, *Ozormoor*, ___ Fed. Appx. at ___, 2012 WL 232951, at *2; *Amway Global v. Woodward*, 744 F. Supp. 2d 657, 669 n.5 (E.D. Mich. 2010) (Rosen, J.).

the Arbitration Order, to construe the contract against defendant and adopt one of plaintiff's proffered constructions.  Neither the law of the case doctrine nor the Arbitration Order, however, supports plaintiff's argument.  As noted above, in reversing Judge Gadola's grant of summary judgment to defendant, the Sixth Circuit held no more than that (1) the "orders booked" language was ambiguous, necessitating reliance on extrinsic evidence, and (2) plaintiff had presented sufficient extrinsic evidence in support of its construction that defendant was not entitled to summary judgment.  *See Urban II*, 216 Fed. Appx. at 504-09.  These two holdings, however, did not compel the conclusion that a finder of fact was required to adopt one of plaintiff's proposed constructions. The Sixth Circuit did not adopt either party's construction of the agreement as a matter of law, and thus that issue remained open to this Court on remand, unaffected by the law of the case doctrine. *See Greenawalt v. Sun City West Fire Dist.*, 250 F. Supp. 2d 1200, 1208-09 (D. Ariz. 2003).

Further, the Arbitration Order and proceedings in the arbitration hearing contemplated that the Panel remained free to adopt defendant's construction of the contract language.  The Arbitration Order directed that the Panel would be bound by *both* the Sixth Circuit's decision *and* Magistrate Judge Morgan's recommendation rejecting plaintiff's law of the case argument.  *See* Arbitration Order, ¶ 5.  In addition, the Arbitration Order provided that defendant was not barred from presenting "any defense . . . based on the assertion that it received new orders for parts after termination[.]" *Id.*, ¶ 13.  And plaintiff apparently understood the Panel as having the authority to adopt defendant's proposed construction of the contract, agreeing in the stipulation for bifurcation that the first hearing before the Panel would be "limited to the issue of contract construction and the panel shall make a determination of which of the parties' proposed interpretations of the contract regarding post termination commissions should be adopted or if some other interpretation should be adopted."

26

Def.'s Br., Ex. 3, at 1.

In arguing that the Panel disregarded the Sixth Circuit's decision, plaintiff notes that Arbitrator Rustmann, in hearings subsequent to the construction hearing and decision, characterized the contract as "unambiguous." *See* Pl.'s Br., at 13 (citing to statements at the September 10, 2010, and January 11, 2011, hearings). However, plaintiff points to no evidence of such statements contemporaneous with the contract construction hearing and decision, and the Panel heard from two lay witnesses and two expert witnesses on the contract construction issue, testimony which would have been wholly unnecessary had the panel simply determined that the contract was unambiguous. Further, the Panel's decision did not state that the contract language was unambiguous; rather, consistent with the Arbitration Order, *see* Arbitration Order, ¶ 14, the panel simply issued an unreasoned decision stating its conclusion. This conclusion, however, was explicitly reached "[a]fter consideration of the proofs[.]" Def.'s Br., Ex. 6, at 2. "Where, as here, the arbitrators decline to explain their resolution of certain questions of law, a party seeking to have the award set aside faces a tremendous obstacle. If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Jaros*, 70 F.3d at 421. Here, in the light of (a) the lack of any contemporaneous statement by the arbitrators at the contract construction hearing that the contract was unambiguous, (b) the Panel's receipt of significant extrinsic evidence on the contract construction issue, and (c) the Panel's statement that its decision was reached after consideration of the proofs, it is legally plausible that the Panel simply found that the evidence supported defendant's construction of the ambiguous contractual provision. Thus, the Panel's decision was not in manifest disregard of the law.

Nor can plaintiff demonstrate that the Panel exhibited manifest disregard for the law by

failing to construe the agreement against defendant, as the Sixth Circuit observed was appropriate under Ohio law.  This rule, however, is merely one aid in construing an ambiguous contract; it does not preclude a finder of fact from construing the contract in the drafting party's favor where the extrinsic evidence and other rules of contract construction support the conclusion that the drafting party's construction better reflects the intent of the parties.  As the Ohio Court of Appeals has observed, "[t]he general rule of construing an ambiguous contract against the drafter does not mean automatically holding in favor of the other party . . . .  Rather, this rule of construction is merely a guiding principle the court uses in determining the parties' intent after viewing the extrinsic evidence presented by the parties. Otherwise, extrinsic evidence would be irrelevant."  *Beverly v. Parilla*, 848 N.E.2d 881, 887 (Ohio Ct. App. 2006) (citation omitted).  Further, under Ohio law, "[p]rimary rules [of contract construction] are always applicable, while secondary rules [such as the strict construction rule] are applicable only after primary rules have been applied and the contract's meaning remains uncertain or ambiguous."  *Malcuit v. Equity Oil & Gas Funds, Inc.*, 610 N.E.2d 1044, 1046 (Ohio Ct. App. 1992).  Thus, "[w]hen interpreting ambiguous contracts, courts must make a legitimate attempt, after hearing the relevant parol evidence, to determine the intent of the contracting parties.  'Where application of this rule makes the meaning of the language clear, the secondary rule of construction of strict construction [sic] against the drafter is not applicable.'"  *Cline v. Rose*, 645 N.E.2d 806, 809 (Ohio Ct. App. 1994) (citation and footnote omitted) (quoting *Malcuit*, 610 N.E.2d at 1046).  In other words, the strict construction rule comes into play only if, after consideration of the extrinsic evidence and other rules of construction, the contract remains ambiguous.  *See Reida v. Thermal Seal, Inc.*, No. 02AP-308, 2002 WL 31819831, at *3 (Ohio Ct. App. Dec. 17, 2002).  Relevant extrinsic evidence includes any evidence bearing on the parties' intent at the time they

28

entered into the contract, such as the circumstances surrounding the parties and the objectives they intended to accomplish, *see Blosser v. Cartre*, 586 N.E.2d 253, 255-56 (Ohio Ct. App. 1990), as well as "evidence of trade usage within the industry in question." *Maverick Oil & Gas, Inc. v. Barberton City Sch. Dist. Bd. of Educ.*, 872 N.E.2d 322, 328 (Ohio Ct. App. 2007). The parties presented to the Panel significant testimonial and documentary evidence with respect to the matters, and it cannot be said that the Panel manifestly disregarded the law in resolving the ambiguity in the contract on the basis of this extrinsic evidence without resort to the secondary strict construction rule.

Plaintiff also argues that the Panel's construction of the contract and determination that all but two of the parts orders did not entitle plaintiff to post-termination commissions were incorrect and against the objective evidence submitted to the Panel. Although the parties discuss a great deal of the evidence presented supporting their respective positions, the Court need not venture into this dispute, because neither an erroneous contract construction nor an erroneous determination of the facts constitutes a proper basis for vacating an arbitrator's award. It is well established that "[a] court cannot vacate an arbitral award as long as the arbitrator is even arguably construing the contract and acting within the scope of his authority." *Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 16, 20 (1st Cir. 2001) (citing *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)). As the Supreme Court explained in *Misco*, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco*, 484 U.S. at 38. Here, the Panel was arguably constructing and applying the contract, and its construction was a permissible one based on the evidence adduced and the expertise of the arbitrators. Apart from its law of the case argument, plaintiff's "principal challenge-properly viewed and also as argued-really

29

is an argument that [the Panel's] award reflects manifest disregard of the evidence, not the law. No circuit has adopted 'manifest disregard of the facts" as a ground for vacatur.'" *Williams v. Mexican Restaurant, Inc.*, No. 1:05-CV-841, 2009 WL 531859, at *10 (E.D. Tex. Feb. 27, 2009). On the contrary, as the Supreme Court has explained, when "an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quoting *Misco*, 484 U.S. at 39). Or, as the Sixth Circuit has explained, neither "errors of fact [n]or misinterpretation of the contract" provides a basis for vacating an arbitration award. *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 328 (6th Cir. 1998) (internal quotation omitted). While plaintiff certainly disagrees with the Panel's decision, and has pointed to evidence which could justify the Court in reaching a conclusion different from the Panel were it determining the matter itself, "[t]he risk that arbitrators may construe the governing law imperfectly in the course of delivering a decision that attempts in good faith to interpret the relevant law, or may make errors with respect to the evidence on which they base their rulings, is a risk that every party to arbitration assumes, and such legal and factual errors lie far outside the category of conduct embraced by § 10(a)(4)." *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 1003 (9th Cir.2003). Plaintiff's "objections to the award, however vehement, do not demonstrate that the arbitrator acted with manifest disregard of the law." *DMA Int'l., Inc. v. Qwest Communications Int'l, Inc.*, 585 F.3d 1341, 1345 (10th Cir. 2009). Accordingly, the Court should conclude that plaintiff is not entitled to vacatur of the award.

D.     *Conclusion*

In view of the foregoing, the Court should deny plaintiff's motion to vacate the Panel's

award, and should enter an order confirming the award in accordance with 9 U.S.C. § 9.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

      The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

      Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 2/17/12

31

4:04-cv-40059-MAG-PJK   Doc # 84   Filed 02/17/12   Pg 32 of 32   Pg ID 2327

The undersigned certifies that a copy of the foregoing
order was served on the attorneys of record and   by
electronic means or U.S. Mail on February 17, 2012.

s/Eddrey Butts
Case Manager